UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| BENJAMIN BEAN, | ) |
|       Plaintiff | ) ) ) |
| v. | )   1:13-cv-00196-NT |
| KENNETH REED, et al., | ) ) ) |
|       Defendants | ) |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff alleges Defendants violated his civil rights when they failed to protect him from an assault committed by another inmate at the Maine State Prison. The matter is before the Court on Defendants' Second Motion for Summary Judgment (ECF No. 81). Following a review of the pleadings and the summary judgment filings, and after consideration of the parties' arguments, I recommend the Court grant in part and deny in part Defendants' motion.

**PROCEDURAL BACKGROUND**

Through an earlier motion for summary judgment (ECF No. 18), Defendants Barnhart and Ponte maintained that Plaintiff had failed to exhaust the available administrative remedies. The Court denied the motion (ECF No. 38), and subsequently scheduled an evidentiary hearing on the exhaustion defense. Following an evidentiary hearing, the Court concluded that Plaintiff seeks redress for "decisions that led to him being placed in the Maine State Prison's general population," and that such decisions "qualify as classification decisions" that are exempt from the Department's Grievance Policy. (Order on Defendants' Failure to Exhaust Defense at 13 – 14, ECF No. 69.) The Court thus denied Defendants' request for judgment based on the exhaustion defense.

On October 27, 2015, Plaintiff filed a stipulation of dismissal (ECF No. 75), through which stipulation he voluntarily dismissed the original defendants.[1] Plaintiff also filed a motion to amend his complaint (ECF No. 73), which the Court granted. (ECF No. 76.) In the amended complaint (ECF No. 74), Plaintiff asserts claims against Defendants Kurt Dyer, Brian Libby, Kenneth Reed, and Troy Ross. Defendants seek summary judgment on the amended complaint.

## FACTS

Plaintiff contends that while he was incarcerated at the Maine State Prison on May 21, 2012, he was assaulted by two other prisoners, Dusty O'Brien and Leroy Parker. (Defendants' Statement of Material Facts ("DSMF") ¶ 1, ECF No. 82.) Before the assault, in April 2012, Plaintiff was assigned to the Maine Correctional Center. (*Id.* ¶ 2.) As part of the intake process at the Center, Plaintiff asked for and received an "Enemy Issue Comment Form." On the form, he identified inmate Robert Fogg as a potential threat and wrote:

> He was or still is my child's mother's boyfriend and I had a [sic] assault on her sister so he had me beat up in 2008 at the Maine State Prison by his "Moose" he was not at the prison yet but I was told if I came back that I would be hurt! The assault was not reported, I told the C/O I fell in the shower.

(*Id.* ¶ 3.) Plaintiff asserted that his life would be in danger at the prison and that Fogg could have someone else attack him. (Plaintiff's Statement of Additional Material Facts ("PSAMF") ¶¶ 1 – 3, ECF No. 88.) Plaintiff's father also contacted the Center to report that Plaintiff would be in danger if placed in the Maine State Prison. (*Id.* ¶ 4.)

Because Plaintiff did not receive medical treatment following the 2008 incident he reported on the form, and because he did not inform the prison staff that he had been assaulted, Plaintiff does not believe there is any record of the incident. (DMSF ¶ 4.) Plaintiff asserts that he did not

---

[1] The claims against the original defendants are now terminated.

make a report due to concerns for his safety. (Pl.'s Opposing Statement of Material Fact ("POSMF") ¶ 4, ECF No. 88.)

Pursuant to Department of Corrections' procedures, the Department investigates enemy reports and decides whether a "keep separate" order is warranted. The procedure is designed to ensure that enemy reports are investigated, that staff are informed of the concern for prisoner safety, and that appropriate action is taken to protect the prisoner. (DSMF ¶ 5.)

After an enemy report form is signed by the prisoner and the staff person to whom it is submitted, the form is immediately forwarded to the chief of security at the facility to which the prisoner is assigned. The chief of security then assigns a sergeant to investigate the matter. (*Id.* ¶ 6.) If the substance of the prisoner's report is verified, the resident chief of security will approve the entry of an appropriate "keep separate" order. Keep separate orders are classified in three levels: Level I - the prisoners may not be assigned to the same unit; Level II - the prisoners may not be assigned to the same housing pod; and facility-wide - the prisoners may not be assigned to the same facility. A prisoner may also be placed in segregation on a temporary basis when required for his protection. (*Id.* ¶ 8.) According to Gary LaPlante, Director of Operations at the Maine Department of Corrections, "prisoners will often fabricate [enemy] complaints in an attempt to manipulate what facility or unit they are housed in, and it is important for the Department to maintain as much flexibility as possible as to where it can house a prisoner." (*Id.* ¶ 7; LaPlante Affidavit ¶ 6, ECF No. 82-2.)

Defendant Kenneth Reed, at the time a corrections sergeant at the Center, investigated Plaintiff's enemy report. Defendant Reed interviewed Plaintiff, who confirmed the information contained in the enemy report form. Defendant Reed also checked CORIS (the Department's prisoner data base) and determined that Plaintiff was a prisoner at the Maine State Prison in 2008

and that Fogg was currently incarcerated at the prison. (DSMF ¶ 9.) Defendant Reed was aware that Plaintiff had been classified as medium custody, that Fogg was being held in the close custody unit at the prison, and thus knew that they would be in separate areas of the prison 95% of the time. (*Id.* ¶ 11.)

Because Defendant Reed was unable to find a record of the alleged 2008 assault or the injury, he recommended Plaintiff's report be considered "unverified." (*Id.* ¶ 10.) Defendant Reed made the recommendation to his superior, Defendant Brian Libby, who was the acting deputy superintendent of the Center at the time. (*Id.* ¶ 10.) In his recommendation, Defendant Reed stated that the report could not be verified and he recommended no restrictions. (PSAMF ¶¶ 7 – 8; Defendants' Reply Statement ¶¶ 7 – 8, ECF NO. 91.) Defendant Libby made the ultimate determination as to whether the report was verified. (DSMF ¶ 10.)[2] The report was deemed not verified.

Plaintiff was transferred to the Maine State Prison on May 17, 2012, and placed in A-pod of the medium custody unit. When he arrived, Plaintiff did not know anyone in A-pod. (*Id.* ¶ 13.) Plaintiff's case worker, Defendant Kurt Dyer, Jr., met with Plaintiff on May 19 to conduct an initial intake interview. (*Id.* ¶ 14.) Before the interview, Defendant Dyer reviewed Plaintiff's records in Plaintiff's "unit file" and on CORIS. (*Id.* ¶ 15.) Defendant Reed's investigative report was not in the unit file or on CORIS.[3] (*Id.*) Plaintiff's file included one keep separate order, but the report involved a prisoner who was not at the prison at the time. (*Id.*)

---

[2] Defendants state that the classification board determines a prisoner's classification and facility to which the prisoner should be assigned. (DSMF ¶ 12.) Defendants also assert that Defendant Reed was not involved in the classification process for Plaintiff. (*Id.*) On occasion, prisoners classified for the Maine State Prison are assigned to the Correctional Center due to enemy issues that might exist for the prisoner at the prison. (PSAMF ¶ 22.)

[3] Plaintiff qualifies the statement and asserts that the record of the keep separate investigation was in Plaintiff's classification file. At his deposition, Defendant Dyer testified that he later learned of the investigation report conducted at the Center. (PSOMF ¶ 15, citing Dyer Deposition at 39, ECF No. 90.) In his summary judgment affidavit, Defendant Dyer states that he learned of the report months later. (DSMF ¶ 24.) Portions of Defendant

Generally, if a prisoner informs Defendant Dyer that he has an enemy issue, Defendant Dyer will log the information and determine whether CORIS contains any relevant information. Defendant Dyer will also alert his supervisor if the prisoner provides a specific name. He attempts to elicit from the prisoner the identity of the person in order to help protect the prisoner from that person. (*Id.* ¶ 16.)[4] If the prisoner identifies a specific threat, Defendant Dyer arranges to interview the prisoner with the sergeant; if they have a cell available in another unit, they will move the prisoner or, if not, place him in segregation for his safety. (*Id.* ¶ 17.)

Plaintiff told Defendant Dyer of his concern about Fogg, and Plaintiff expressed surprise that his file and CORIS did not contain any information about the enemy investigation regarding Fogg. (PSAMF ¶ 18.) Plaintiff informed Defendant Dyer that after his arrival at the Prison, he was approached by prisoners in his pod who said they believed he was a sex offender, and said they were going to investigate whether he was a sex offender; Plaintiff told Defendant Dyer that he felt threatened. (*Id.* ¶ 18; DSAMF ¶ 10.) One of the prisoners who confronted Plaintiff was inmate O'Brien, one of Plaintiff's assailants. (POSMF ¶ 19.) Plaintiff specifically identified inmate O'Brien when he expressed his concern to Defendant Dyer.[5] (*Id.*) When Defendant Dyer examined Plaintiff's criminal history, he noted no evidence of a sex offense, but only a history of an assault. Plaintiff told Defendant Dyer that the assault was a sex offense, but the charge had been pled down. (DSMF ¶ 18.) Defendant Dyer told Plaintiff that if anyone looked up his record,

---

Dyer's deposition testimony suggest that the classification file and the unit file are separate files and that Defendant Dyer would not normally review a classification file although he had access to it. (Dyer Deposition at 23 – 24.) In any event, the report was not in the unit file or on CORIS, though Defendant Dyer would have expected to find them in both places. (*Id.* at 24, lines 13 – 18.)

[4] Defendants' Statement of Material Facts cites Defendant Dyer's deposition testimony. Gary LaPlante, the Director of Operations of the Maine Department of Corrections, also states in his affidavit: "It is important for the Department to determine the identity of the person or persons who the prisoner believes to be a threat, so that the Department can take specific action to keep the prisoner separate from those individuals." (LaPlante Affidavit ¶ 7, ECF No. 82–2.)

[5] This fact is contested, but for purposes of summary judgment, Plaintiff's assertion that he supplied Defendant Dyer with inmate O'Brien's name is accepted as true.

they would see an assault, not a sex offense; he, therefore, advised Plaintiff not to characterize his offense as a sex offense. (*Id.*)

Plaintiff also discussed with Defendant Dyer his concerns about Fogg, told Dyer that the person referred to as "moose" who assaulted him in 2008 had warned him not to return to the Maine State Prison, and informed Dyer that he had seen "moose" upon his arrival at the prison. (DSMF ¶ 20; POSMF ¶¶ 20, 22; Bean Deposition at 21, ECF No. 89.)  Plaintiff told Defendant Dyer that he needed to be moved and that he was concerned about Fogg and his "boys."  (POSMF ¶ 20; PSAMF ¶ 12.)  Defendant Dyer informed Plaintiff that everything was full at the time, and there was no place to put him.  (DSMF ¶ 21; POSMF ¶ 19.)

Defendant Dyer also advised Plaintiff that if he started to have issues with anyone, he should contact him, the pod officer, or the sergeant.  Defendant Dyer informed the unit sergeant, Defendant Troy Ross, of his conversation with Plaintiff, and told him to keep an eye on Plaintiff.  Finally, Defendant Dyer advised the zone control officer of Plaintiff's concerns.  The zone control officer is stationed in the unit and operates all doors and cameras.  Defendant Dyer also was aware that Plaintiff could go to his cell and lock himself in if he felt threatened.  The interview with Plaintiff occurred on May 19; Defendant Dyer was not scheduled to work on May 20 and 21. (DSMF ¶ 22; POSMF ¶ 22.)

According to Defendant Dyer, even if the report of the keep separate investigation had been in the files Defendant Dyer reviewed, the circumstances would have resulted in a Level I order and thus Defendant Dyer would not have taken steps to move Plaintiff because Plaintiff and Fogg were not assigned to the same area of the prison.[6]  (DSMF ¶¶ 21, 25.)  Two days after Plaintiff's

---

[6] Plaintiff states:  "Mr. Dyer testified that if an inmate has an issue that he feels his life is in danger or his immediate safety may be in danger, then the Prison would segregate him."  (PSAMF ¶ 14.)  The deposition transcript reflects that Defendant Dyer qualified his testimony when he stated "depending on the severity of the enemy issue."  (Dyer Deposition at 16, line 25.)  Plaintiff states:  "Mr. Dyer also testified that it would be appropriate to move an inmate to

6

interview with Defendant Dyer, Plaintiff was assaulted in his cell by two prisoners, Dusty O'Brien and Leroy Parker, and sustained serious injuries. (*Id.* ¶ 23.)

The Prison's internal perimeter security team informed Defendant Dyer that the Correction Center was at fault for the incident because someone failed to report or put the enemy investigation report in the proper place. (PSAMF ¶ 21.) The team also told Defendant Dyer that he should have reviewed Plaintiff's classification file. (*Id.*)

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir. 2015). If the court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied to the extent there are supported claims. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal

---

segregation who expresses that not only a specific person has threatened him, but also when the person has threatened that others associated with that person will harm the inmate." (PSAMF ¶ 15.) A review of the deposition transcript reveals that Defendant Dyer merely agreed that it "might be appropriate" to move an inmate under those circumstances. (Dyer Deposition at 17, lines 17 – 20.)

quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## DISCUSSION

In his amended complaint (ECF No. 74), Plaintiff asserts one count of "deliberate indifference" under 42 U.S.C. § 1983, and a companion count under the Maine Civil Rights Act, 5 M.R.S. § 4682. Through their motion for summary judgment, Defendants argue that Plaintiff has not exhausted his administrative remedies and that the record will not support a finding that Defendants were deliberately indifferent to a substantial risk of serious harm to Plaintiff.

**A.      Failure to Exhaust**

Although the Court previously determined that former Defendants Barnhart and Ponte failed to establish that the Department of Corrections grievance procedure was available to Plaintiff with respect to the classification decision that resulted in his transfer to the Maine State Prison, Defendants Dyer and Ross argue that Plaintiff was required to exhaust his administrative remedy under the Department of Corrections Grievance Policy on his claim against them for a breach of a duty to provide for his safety after his transfer to the Maine State Prison.

In its prior Order on the failure to exhaust issue, the Court found that the Grievance Policy does not permit a prisoner to file a grievance concerning classification procedures and decisions. (Order of Defendant's Failure-to-Exhaust Defense at 13, ECF No. 69.) Analyzing the impact of this exception on Plaintiff's right to grieve matters related to his placement in the Maine State Prison, the Court wrote:

> In short, the official conduct the Plaintiff's Complaint seeks to redress is the decision or series of decisions that led to him being placed in the Maine State Prison's general population in May of 2012, despite his warnings that he was in danger there. Under the most straightforward reading of the Grievance Policy,

> which is the only policy the Defendants introduced into evidence, those decisions qualify as classification decisions. On these facts, the Defendants have not demonstrated that there was a generally available remedy for the claim raised in the Plaintiff's suit.

(*Id.* at 13 –14 (footnote omitted).) In support of its conclusion that Plaintiff's claim was within an exception to grievance requirement, the Court noted that the classification policy extended to administrative segregation, protective custody, and custody level determinations. (*Id.* at 11 n.8.) More specifically, in its prior Order, when addressing Defendants' contention that Plaintiff's claim is in essence a failure-to-protect claim and thus within the grievance process, the Court observed: "The problem for Defendants is that the Plaintiff's failure-to-protect claim can be characterized as a claim from the 'event' of his attack *or* as a claim based on a classification issue." (Order at 12 – 13) (emphasis in original).

Plaintiff contends the decisions made by Defendants Dyer and Ross were part of "a series of decisions that led to him being placed in the general population," and that his claims against Defendants Dyer and Ross are based on their decisions "regarding Mr. Bean's placement in the general population." (Response at 7.) Plaintiff's claim, therefore, is focused on whether Defendants assigned Plaintiff to live in an appropriate location within the Prison (e.g., whether Plaintiff should have been assigned to protective custody, administrative segregation, etc.) Although Defendants contend they were not involved in the decision to transfer Plaintiff to the Prison and otherwise were not involved in Plaintiff's classification, the record includes facts from which a fact finder could conclude that Defendants Dyer and Ross were involved in the decision as to how Plaintiff would be classified within the Prison. In fact, one of the purposes of Defendant Dyer's initial meeting with Plaintiff was evidently to determine whether any issues existed that required different living arrangements, including segregation, for Plaintiff. (DSMF ¶ 17.) Given that the gravamen of Plaintiff's claim is that Defendants Dyer and Ross did not take measures to

change Plaintiff's classification or to assign Plaintiff to a location other than the general population at the Maine State Prison, the conduct about which Plaintiff complains is the involvement of Defendants Dyer and Ross in "the decision or series of decisions that led to him being placed in the Maine State Prison's general population in May of 2012." (Order at 12 – 13). Because the record includes evidence from which a fact finder could conclude that Defendants Dyer and Ross were involved in "the decision or series of decisions," the Court's exhaustion analysis is equally applicable to Plaintiff's claims against Defendants Dyer and Ross.

**B.      42 U.S.C. § 1983 (Count I)**

In Count I of the amended complaint, Plaintiff alleges Defendants violated his constitutional right to protection from violence at the hands of other prisoners. (Am. Compl. ¶¶ 22 – 29.) More specifically, Plaintiff alleges that Defendants Libby and Reed acted with deliberate indifference toward a substantial risk to his safety when they made the decision to allow Plaintiff to be transferred to the Maine State Prison, "where he was assaulted within days." (Am. Compl. ¶¶ 4, 5, 16, ECF No. 74.) Plaintiff also contends Defendants Dyer and Ross acted with deliberate indifference to the same risk when they "placed Plaintiff at the Maine State Prison, where he was assaulted shortly after his arrival." (*Id.* ¶¶ 6, 7, 20.) Plaintiff further maintains a deliberate indifference finding is warranted because Plaintiff placed Defendants on notice that another inmate at the Maine State Prison was his enemy and that he would be in serious danger at the Prison. (*Id.* ¶¶ 12 – 15, 17 – 18.)

Defendants argue that summary judgment is appropriate because the record cannot support a finding that they "were subjectively aware of a significant, identifiable risk to Bean," and because the steps they took to investigate the incident and guard against harm to Plaintiff show that they "were not deliberately indifferent to Bean's safety." (Motion at 8 – 9.)

The Cruel and Unusual Punishment Clause of the Eighth Amendment, as applied to the states through the Fourteenth Amendment, imposes a duty on prison officials to protect inmates from violence at the hands of other inmates. *Lakin v. Barnhart*, 758 F.3d 66, 70 (1st Cir. 2014). "That duty has its origins in the forced dependency of inmates[.]" *Giroux v. Somerset Cty.*, 178 F.3d 28, 31 (1st Cir. 1999). "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1970) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)).

Under the law, however, not every incident of prisoner-on-prisoner violence that results in injury gives rise to constitutional liability. *Lakin*, 758 F.3d at 70. To raise a genuine issue of constitutional liability, a plaintiff must demonstrate both that he was "incarcerated under conditions posing a substantial risk of serious harm," and that the defendant "acted, or failed to act, with 'deliberate indifference to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). In other words, a plaintiff must satisfy both an objective standard (substantial risk of serious harm) and a subjective standard (deliberate indifference) in order to prove a claim of deliberate indifference. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

### *1.     The objective standard*

To meet the objective requirements of a deliberate indifference claim, Plaintiff must present evidence that Defendants had knowledge of facts that would cause a reasonable person in

11

their position to conclude there was a substantial risk that Plaintiff would suffer serious harm. *Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 20 (1st Cir. 2014). A substantial risk is more than some risk; substantial risk has been described by the Supreme Court as a risk that is "objectively intolerable." *Lakin*, 758 F.3d at 71 (quoting *Farmer*, 511 U.S. at 846). It has also been characterized as an unusually serious, or grave risk. *Ramirez-Lluveras*, 759 F.3d at 21; *cf. DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991) (describing "actual knowledge of impending harm").

                *a.*     *Defendants Reed and Libby*

The record reflects that the 2008 assault was not reported by Plaintiff when it happened, and thus the prison's records lack any evidence of an assault by Mr. Fogg. With the absence of a report of an assault and the lack of evidence of an assault, Defendant Reed determined that Plaintiff's enemy report was unverified. Defendant Libby reviewed and relied on the report. Given the results of Defendant Reed's investigation and given that Plaintiff and Mr. Fogg would be separate for 95% of the time, the record would not support a finding that Defendants Reed and Libby were aware of, or should have been aware of, substantial risk that Plaintiff could suffer serious harm.

                *b.*     *Defendants Dyer and Ross*

Defendants Dyer and Ross were not aware of Defendant Reed's enemy investigation report. Their conduct, therefore, is based on the information of which they had knowledge prior to the assault.

At the time, Defendant Dyer was aware (1) that Plaintiff reported he had been assaulted during a previous stay at the Prison, (2) that the assailant (i.e., "moose") was still at the Prison, (3) that Plaintiff had seen "moose" upon his arrival at the Prison, (4) that the person Plaintiff alleged

to have directed the assault (Mr. Fogg) was still at the Prison, (5) that following the earlier assault, Plaintiff had been threatened with further harm if he returned to the Prison, (6) that Mr. Fogg had others in the Prison whom Plaintiff believed could or would assault other inmates at Mr. Fogg's request, and (7) that soon after his arrival at the Prison, Plaintiff had been threatened by two other inmates based on their understanding of Plaintiff's criminal history. Simply stated, the facts, when viewed most favorably to Plaintiff, would be sufficient to satisfy Plaintiff's burden to present evidence upon which a fact finder could rely to determine that Defendant Dyer was aware of a substantial risk of serious harm (i.e., the harm that would necessarily result from an assault by another prisoner or prisoners) to Plaintiff.[7]

The record also contains sufficient evidence from which a fact finder could conclude Defendant Ross was aware of most, if not all, of the information available to Defendant Dyer. According to Defendant Dyer, he informed Defendant Ross of his conversation with Plaintiff. (PASMF ¶ 19).[8] While the record might not include an exhaustive list of the facts Defendant Dyer conveyed to Defendant Ross, a fact finder could reasonably infer that Defendant Dyer shared with Defendant Ross all of the material information he obtained from Plaintiff. Indeed, the record lacks any suggestion that Defendant Dyer withheld any material information from Defendant Ross.[9]

---

[7] Plaintiff is not required to prove that Defendants knew he would be assaulted or knew precisely who would assault him. *Giroux*, 178 F.3d at 33 (citing *Farmer*, 511 U.S. at 843); *Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1583 (11th Cir. 1995).

[8] During his deposition, Defendant Dyer testified, among other things, that "I told my sergeant that I just had this conversation with Mr. Bean, he stated that he was having issues with Robert Fogg, he stated that he had these issues before he came to Maine State Prison, while he was at Windham …" (Dyer Deposition at 31.) He also testified that he informed Defendant Ross that Plaintiff had issues with inmates in his own pod in addition to Mr. Fogg, and that the inmates in Plaintiff's pod had harassed Plaintiff based on their belief he was a sex offender. (Dyer Deposition at 31-32.)

[9] As a supervisory officer, direct involvement in a constitutional deprivation is not the only means of establishing Defendant Ross's liability; if Defendant Ross had grounds to conclude that Defendant Dyer's report of the matter was missing information necessary to see to Plaintiff's safety, Defendant Ross's failure independently to investigate the issue could be regarded as condonation, tacit authorization, acquiescence, or gross negligence regarding known or

### 2. *The subjective standard*

In addition to establishing the existence of a substantial risk, a plaintiff must present evidence that the defendant possessed a culpable state of mind amounting to "deliberate indifference." *Farmer*, 511 U.S. at 834. "The 'deliberate' part of 'deliberate indifference' was defined by the Supreme Court as requiring that a prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Burrell v. Hampshire Cty.*, 307 F.3d 1, 8 (1st Cir. 2002). Culpability on the order of deliberate indifference has been likened to criminal recklessness and, accordingly, is more serious than ordinary negligence. *Id.* Consequently, if an official was aware of a substantial risk of serious harm to an inmate and harm resulted, the official cannot be found to be deliberately indifferent if he responded reasonably to the risk. *Burrell*, 307 F.3d at 8 (citing *Farmer,* 511 U.S. at 844). Additionally, even if a risk would be obvious, such that a reasonable person would conduct himself in a particular way, an official's failure to observe the standard of ordinary care will not result in liability if he can demonstrate that what might have been apparent to others was not obvious to him. *Id.* Finally, "[a]ny inquiry into the reasonableness of the prison officials' actions 'incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Id.* (quoting *Farmer*, 511 U.S. at 845).

#### a. *Defendants Reed and Libby*

Because the record would not support a finding that Defendants Reed and Libby were aware of a substantial risk of serious harm to Plaintiff, the reasonableness of Defendants' response to Plaintiff's report to Defendant Reed cannot be the basis of liability.

---

obvious deficiencies in Defendant Dyer's investigation. *Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012); *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999).

      b.     *Defendants Dyer and Ross*

Given the information known to Defendants Dyer and Ross, their decision not to recommend or implement a reclassification or relocation, but instead to keep an eye on Plaintiff, could support a deliberate indifference finding against Defendants. In fact, one could reasonably infer from Plaintiff's report of Defendant Dyer's explanation for the decision not to relocate him – that "there is no place to put me, every place is full" (Bean Deposition at 28, ECF No. 89) – that Defendant Dyer was aware that a relocation was appropriate and thus that the failure to relocate Plaintiff under all of the circumstances "was more serious than ordinary negligence." *Burrell*, 307 F.3d at 8.

## C.    Maine Civil Rights Act (Count II)

"The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA." *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (citing *Dimmitt v. Ockenfels,* 220 F.R.D. 116, 123 (D. Me. 2004)). Plaintiff, therefore, has not presented a record upon which a factfinder could reasonably conclude that Defendants Reed and Libby are liable under the Maine Civil Rights Act. For the reasons explained in the context of Plaintiff's § 1983 claim, Defendants Dyer and Ross are not entitled to summary judgment.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant in part and deny in part Defendants' Second Motion for Summary Judgment. (ECF No. 81.) Specifically, I recommend the Court grant the motion as to and enter judgment in favor of Defendants Reed and Libby. I also recommend the Court deny the motion as to Defendants Dyer and Ross.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to

15

28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 17th day of May, 2016.